al. Good afternoon, Your Honors. May it please the Court, my name is Darcy Madden, and I represent one of the three appellants in this case, Todd Gearheart, who was not a party to the underlying litigation until he was accused of and found liable for civil contempt for violating an order that was not directed to him as a result of conduct that was not specifically and unequivocally prohibited by the order. The primary issue on appeal for Todd Gearheart is the proper construction of the order and whether the limited conduct in which he was shown to have engaged violated a specific and unequivocal provision of that order. And the answer to that question is no. It is axiomatic that a court must construe its orders narrowly for purposes of assessing civil contempt liability. A court must find by clear and convincing evidence the violation of a specific and unequivocal provision of the order. And it's quite clear cases are legion holding that ambiguities must be resolved in favor of the party who's charged with contempt. It is a quasi-criminal remedy. In this case, the Court did just the opposite. The Court repeatedly and inappropriately cited to the facts and circumstances surrounding the entry of the order and the party's intent. Well, looking at the plain language of the order, is your principal argument that we don't know what a customer or supplier is? That is part of it, Your Honor. Why don't we? Why isn't that language, customer or supplier of plaintiffs with whom Doar's had contact or performed services? So if Doar or somebody who subsequently becomes involved with him, if Doar had contact or performed services for a customer or supplier of plaintiffs, doesn't that seem sort of on facial understanding applied to any of those customers or suppliers with whom he had contact? Your Honor, I think at most it's ambiguous. It says customers or suppliers, and that language with whom Doar's did business, it's at least ambiguous as to whether that enlarges the scope of customers or suppliers or narrows the scope of that. In this case, the party that provided the money that Todd Gerhart was used as a conduit to transmit was a company called Wawason. Wawason had stopped doing business with the plaintiffs months before because they were owed millions of dollars. Is that why they had a debt that wasn't paid? Is that why they were broke away? Right. So they terminated their contract with the plaintiffs. It would have been entirely reasonable to write an order that didn't include Wawason. There's no showing, for instance, that anything that happened between Mr. Doar's and Wawason had any impact on whether they would have gone back and done business with the plaintiffs. They had terminated a long time before. It has to be beyond question, the clarity here, but it seems to me the most natural reading of this is that it was prohibiting taking advantage of the former work that had been done for the other company, and that means whether it was Wawason, who was no longer a supplier or a customer, or somebody else who was or was no longer a supplier or a customer, that those relationships could not be revived under a new company. And Your Honor, the issue is... Isn't that what this is doing?  Isn't that what this is doing? The issue is that the court was not charged with determining what the most reasonable interpretation of the order was. The court was charged with looking at the order very narrowly and asking whether it specifically and unequivocally prohibited this conduct, and it did not. And the court essentially conceded as much by repeatedly looking to the facts and circumstances surrounding the entry of the order and the intent of the parties who did not even include Todd Gearhart. There was an additional ambiguity in the order that helps bring this into focus, and that is that the order didn't prohibit all contact with customers or suppliers. It prohibited soliciting those folks for the purpose of creating a contractual or other business relationship, and the court essentially read that created for the purpose of soliciting part of the order out completely. But it's pretty clear, it says, if an employer contacts you, Doris, to create a contractual relationship with a customer with whom Doris had contact, he's supposed to say thank you. He's not supposed to take $20,000. So if Wawasan is an employer that contacts him in order to solicit Bunnett's customers, that's in direct violation of that. So first of all, there was no showing that the money was provided for the solicitation of customers. Well, I thought that Lady Wei Su said exactly that. She later recanted it, but she said at the outset for Agrofin, yeah, we were paying him, Doris, to solicit Bunnett's customers. That is true, Your Honor, but there's no evidence that my client, Todd Gearhart, knew that. So then your argument is not that the language doesn't prohibit what Doris do, and there is evidence to support it, but it's that your client didn't know about the prohibition. What contempt case do you have, can you think of, where the answer of the respondent is, well, I did conceal payments, but I didn't know about the order that allowed the magistrate to infer he knew about the order because he structured this incredibly tortured hidden payment structure? Your Honor, first of all, the Whitcraft case, I think, is directly on point. In that case, the defendant knew that there was a freeze order in place. She did not know the specific provisions of the freeze order. But did she inform herself at all in what Judge Higginson is talking about and try to And it seems to me that the difference there is it wasn't all that clear to an unsophisticated person, or even just sophisticated maybe, that that would have prevented her from selling her own property. And here we have your client involved in an incredibly suspicious way of receiving this money. And Your Honor, the only evidence that was in the record is that Todd Gearhart did a favor for his father and passed along this money. He had nothing to do with structuring this transaction. And this wasn't designed by Todd Gearhart to evade detection. All he did was to say to his father, yes. It was probably the dumbest thing he's ever done. His emails with his father are saying things like, I hope this doesn't blow up. I hope it doesn't come back to us. And at the same time, he's a client of Wawa Sands. He is, yes. His company did some business with Wawa Sands. There was evidence in the record that the plaintiffs are very litigious, that they've sued numerous business partners. But who creates fake and phony invoices because they're fearful of being sued? It's at least a legitimate inference for the magistrate to say he knew about this order, his dad knew about it, and they made a big mistake. And the question, Your Honor, though, is whether it violated a specific provision. That gets back to the beginning, and that language seems pretty clear. Did an employer contact Doris to set up a relationship with Bunnett's customers? And what's her name? Wei Su said they did. And Your Honor, there is no evidence that Todd Gearhart ever saw that second provision of the order that said, if you're contacted, this is what you say. The evidence in the record, Your Honor, was that he had an awareness of a prior state court TRO, which does not amount to notice of this order, and I believe that order did not include that second paragraph, and that he had a general awareness, a vague understanding that there was some sort of an injunction, but again, there was no specific finding that he had any knowledge of that second paragraph about if you're contacted, do this. And I think as a quasi-criminal remedy, it has to be clear, by clear and convincing evidence, he has to have been on notice that his conduct would have fallen within that order. Thank you. Good afternoon. It may please the Court. I think to join the discussion, I think this case does illustrate the dangers and difficulties of applying these anti-solicitation provisions in TROs and business cases. So, Judge Southwick, I want to address your question first. Our position is clear and unmistakable from our briefs, which is that there was basically a mix and match at the lower court level between what this Court has clearly distinguished in the past. You've done it, Judge Higginson. You've done it, Judge Owen, between an anti-solicitation provision on the one hand and a non-compete on the other. That's where I think that the train got off the rails here, because the issue that we're talking about, Judge Southwick, is the provision, that paragraph 2 that you read from, deals with acts of solicitation. It does not deal with a situation where you can say, as the district court did in the case, that the meaning of the order was to prohibit TROs from having contact with the person with whom he had dealt when employed by Bunnett. But your defense, you didn't argue to the magistrate that, oh, this is legitimate payments for services not covered. You said it was a gift from Wawasan. That was part of the testimony in the record, absolutely, Judge, and to your point that you made. No, don't. Before you get off that, where in the record ever in those two days did you say what you just said to Judge Southwick? Oh, it's in both the pre-contempt hearing briefing and the brief. During the trial, did you argue that these were legitimate payments for services or that it was a gift from Wawasan? No, no, no. The argument that I'm making now, Judge, is that this TRO was limited to anti-solicitation, not non-competition. And so, in other words, to your point earlier in the question, the evidence would need to indicate that during the time period of the TRO, which, you know, the State Court TRO went out the window, but between January 13th and February 1st of 2016, that there was some act, direct or indirect, of solicitation for the purpose of creating a business relationship during that time period. If things happened before that time period, before that TRO went into effect, obviously the court can't punish somebody for that. Right, but the court made a note that Doris is being very careful. He's not using anything that records things, but he gets a big chunk of money right in the middle of those two weeks, and therefore he, the district court, draws the inference, having heard everyone and found people, I think it's quite remarkable, he said, I almost felt it was perjury, it was fraud, it's sheer unbelievability, plus inconsistent, and the emails are implicating, and from all of that, I infer he was soliciting in those two weeks. Yeah, absolutely. So, you know, I've been before you on both criminal and civil cases. I do both. And so I like to borrow from people who are a lot smarter and wiser than I am. But somebody once said that the law does not pretend to punish everything that is dishonest because that would seriously impair or interfere with business. And I think that's true here, Judge, that all of this evidence of, we're not taking issue with that, evidence of why in the world didn't these people get lawyers and why didn't they have somebody advise them, this was not a non-compete agreement, why couldn't they get somebody to advise them that the only thing this TRO does, it prevents you from soliciting current customers during the time period. Didn't Wei Su say that's exactly what Doris did? But the timing is, that's where the timing gets off. Oh, it's the timing. You think he may have done it before, he didn't do it during the two weeks. And it relates to our thing, too, because that's, the evidence is undisputed that there was an active relationship being developed with DORS, not my client, but with DORS and And that's why the timing of my co-counsel is so important, because the Wawasan slammed the door on their exclusive distribution agreement with EFI, November 14th of 2015. They did so because they were owed $3.4 million on their arrangement. That thing was kaput. And so because the Wawasan— And then they create Agrofim. Yes, sir. And you're not disputing that the evidence supports the conclusion that Doris becomes an employee of theirs for purposes of soliciting customers. You're just saying that there wasn't evidence that he did it during that period. Yes, sir. And the money payment alone wouldn't violate the TRO? No, it would not, because if anything, that money payment relates to the relationship that DORS has with Wawasan. And because Wawasan was a supplier to EFI at one time that was no longer a supplier, then by virtue of that plain scenario, it's clear that whatever that payment was could not have been part of soliciting an agreement or an understanding that it already existed. And it's very important, Judge, to think about, too, in their brief, they talk about the fact that there was, quote, circumstantial evidence to support the idea that somehow that DORS had involvement with Bunnett or EFI clients during that limited time window. Circumstantial evidence does not cut it in this context. Wait, I'm going to ask the same question I asked your prior counsel. Did you make this argument to the magistrate? Yes. Did you say, we admit he's soliciting, but he just didn't do it in the time period? I don't know that they admit— I don't know that it was necessary, Judge, to admit that he was soliciting. I don't think it was— I think— I thought the whole theory was it's a gift. No, that's a straw man argument put up by them. The principal argument— look at our pre-contempt hearing brief and the post-contempt hearing brief. Right up front are the very arguments that we're making to you, which is that the scope of the TRO is not sufficient. It's an anti-solicitation provision. It's not a non-compete. There are extreme differences between the two that this Court has recognized. You were on a panel where that very issue came up in the context of— No, I understand that. I'm not sure that— So— Yeah, go ahead. But that's the distinction that we believe was very much lost here. And so for that reason, we believe that that is what got the thing completely off the rails from the get-go. Now, the second point is the point that I made earlier. There's no evidence other than, you know, what they call circumstantial evidence to support the idea that there's active solicitation going on where my client is participating in that during that limited window of January 13th to February 1st. The third point that we have in the brief, it's obviously subsidiary to the rest of that, is that disgorgement was used as a remedy here. It's clear from the record that that was intended. It's what the plaintiffs asked for in their disclosures. It's what they asked for at the contempt hearing. It's what the judge referred to in his report and recommendation. Our position there, obviously, is that disgorgement is not appropriate in the circumstance where it's undisputed that my client—I think there's evidence that he facilitated these payments that you discussed, but I don't think there's any evidence that he received any of that. So that's a straight-up legal question that I think we could commend to your attention. And unless there are other questions, I'll return the remainder of my time to the Court. Thank you. May it please the Court, Matthew Pruitt, Counsel for the Appellees and below the Plaintiffs and Movements. The trial court in this case, found by clear and convincing evidence following a two-day evidentiary hearing and a consideration of an additional extensive factual record submitted by deposition testimony, by clear and convincing evidence that the three appellants had actual notice of the TRO, that finding was based on their own sworn testimony and interrogatory responses for each of them. The trial court found that each of the three contemnors knew and understood that their conduct violated the TRO. This was based by admissions under oath by both Mr. Ray Gearhart and by his son, Mr. Todd Gearhart, that they understood that the TRO prohibited Mr. Doars from working with Wallace on. Both gave that testimony. In addition, the trial court found that the three contemnors acted in concert in order to violate the TRO with the knowledge that they were acting in concert to violate the TRO. And then finally, the court found by clear and convincing evidence that the three contemnors acted in concert not just to violate the TRO, but to conceal their violation of the TRO in the hope of escaping punishment. These factual findings have ample support in the record from the contemnors' own testimony and provide ample basis for this court to affirm. All this evidence you're talking about, there certainly is a lot that was presented. Let me ask you a few things about the evidence. What evidence is there that during the two-week period of the TRO, of what they did, specific direct evidence of what they did during that two weeks? The evidence that is uncontroverted entirely is the evidence of the payment scheme. Okay. So beyond that, is there any activity by either of the two appellants during that two-week period that is based on direct evidence? The evidence that we have about the payment scheme includes violation of the TRO because Wallace is a supplier of the Bunnett, an energy feeds company. But you're still talking about the $20,000 payment, correct? I'm sorry, Your Honor. You're still talking about the $20,000 payment? That is the $20,000. Okay. So I'm just asking, is any other event, any other solicitation, any other whatever you want to call it, during that two-week period that's based on direct evidence? The court made findings by clearing convincing evidence relying on circumstantial evidence in inference. I think that's a no there. In terms of direct evidence, no, Your Honor. Okay. That's all? Yes. And other evidence? I'm not trying to take that away from you. I just want to make sure. Okay. We turn to your argument. Thank you, Your Honor. So looking at the—there are multiple—the interesting thing about this order is that there are multiple ways that it can be violated. It addresses customers as well as suppliers. So Todd Gearhart was a vice president of a Bunnett and energy feeds customer, in fact, the very largest customer of Bunnett and energy feeds. Wauwesan was a supplier of energy feeds. And then, of course, Wauwesan was also a—even if Wauwesan had not been a supplier of Bunnett and energy feeds, the court found by clearing convincing evidence that Wauwesan was paying doors for the purpose of developing business with Bunnett and company and energy feed customers. So that even if Wauwesan had been a complete stranger, even if J.D. High School, Mr. Todd Gearhart's employer, of which he was the vice president, had been a complete stranger, the payments would have still violated the TRO because someone reached out to Mr. Doars. First, Mr. Doars reached out, then they reached out back to him, there was communication back and forth, and he got paid for services rendered. There's a— Gearhart, though, they have to be on notice that Doars' work would be violative of the provision, correct? And we have an abundant testimony from both. And so you think the most stark violation was that he engaged in prohibited solicitation? Or do you think it was he had a relationship with Wauwesan and that alone was violative? Which is it? Your Honor, we think that the second sentence, the last sentence of the decretal paragraph that's the focus, is really what cinches this. So if you want to call that the most troubling or the most obvious violation, it's the sentence that appellant's counsel was questioned about. In the event that? In the event that. Yes, Your Honor. Okay. And that's why this is not—I was surprised to hear the argument raised for the first time today that this is only a non-solicitation covenant. That argument does not appear below, it does not appear on the counsel's papers submitted, but it obviously is not. If Doars had not acted in a sales capacity and in—prior to the two-week period, and then he got paid a salary during the two-week period, not for soliciting customers, there would be no violation of the TRO then? I would actually disagree with that, Your Honor. But it wouldn't implicate that second sentence then? We'd have to look at a more subtle interpretation of the first, correct? I think it would be a clear violation of the second sentence, Your Honor. If he just worked for Wauwesan in a non-soliciting, non-sales capacity and he gets paid later? There would have to be—I understand your question better now, Your Honor—there would have to be some nexus between the reason why the payment was being made and the expectation of what Mr. Doars might do at some point. Right. But this second sentence, to be clear, is not restricted to making payment—making solicitations contemporaneous with the payment. Right. It says that Mr. Doars is prohibited if somebody, a person, employer, entity, contacts Doars for the purpose of creating a contractual or other business relationship with any customer or supplier of plaintiff with whom Doars had contact or for whom he performed services during his employment with plaintiffs. Doars is supposed to shut down that discussion and have no business dealings with them. He's supposed to say, thank you, leave me alone. And the evidence that the magistrate had that that did occur came especially from Waysu and then the emails of the Gearhertz that, oh, we worked with him to get customers? Is that the primary two-piece of evidence? Yes, there is that. And then the court also did attach significance to the fact and the amount of the payment. The $20,000 payment, there was, to be clear, there was a new relationship in January of 2016 because Mr. Doars previously had gotten paid through his wife and through his LLC that he created. Now he was getting paid through this pipeline of friends and neighbors going through another LLC that created by Mr. Todd Gearhart. Did the Gearhart and Doars all three testify? I'm sorry. Did they all testify? Both Gearharts testified. Doars? Mr. Doars testified by video conference at his request, but it was live. Was their theory singular that Wawasan was just giving a gift out of appreciation? Or did they argue, oh, yeah, we had an employment relationship with him, but it just wasn't the one prohibited? It was entirely a singular defense that was presented, Your Honor. It was emphatically not a straw man. I don't fault counsel. He's come into this case only as appellate counsel, not as trial counsel below. But that was the main focus of the two days of testimony.  When you say that, it could be a gift. That it was a gift. Right. And there's a ... That's what they said under oath at trial. At the hearing. They said under oath at the hearing. That was the defendant's principle, if not ... They only had two, they had three issues that they were trying. One issue, that Todd Gearhart had no notice of the order. Second, that it did not violate, the payment did not violate the order because it was a gift. And third, that the payment did not violate the order because Mr. Doars had no business relationship at any time with the defendants or with the Kemptemnors. And so, we spent a great deal of effort and a great deal of time proving that this was not a gift. And there was no alternative, innocent explanation ever offered by the defendants. And there is a very good reason for that. Because Mr. Ray Gearhart testified repeatedly that he understood, one, that he couldn't work with Frank or help Frank work. That was his understanding of what he was prohibited from doing. And that he also said that he did not read a distinction, his own counsel. Mr. Gerger from Quint Emanuel was representing him at trial and he asked Mr. Ray Gearhart, he said, Ray, do you read a distinction in this order, this temporary restraining order, between current and former customers or suppliers? Mr. Gearhart looked straight at his own counsel and said, no. He said, I don't get that from this order. Mr. Todd Gearhart testified specifically that he understood that this order enjoined Frank Doars from doing business with Wawasan. That's in the Record on Appeal at 527, I believe, 7-7, 5276 through 7-7. Mr. Ray Gearhart's testimony goes over several pages from Record on Appeal 5462 through 5471. So the Court, when we think about, again, I want to be clear that it is not the appellee's position that there is only a single basis for affirming this contempt. But if the panel thinks that it is important for their- If a person has been ordered not to do business with another person and understanding that if I- and knowing that the order also applies to me and that if I have discussions or commerce with him, I'm also subject to contempt, it seems to me that that's the- isn't that the nub here? That distinction is not an argument that was advanced or through testimony or argument of counsel below. Was your testimony that they knew that they were not supposed to participate and if they did, they could be held in contempt? Their testimony- Todd's testimony, Todd Gearhart's testimony was that he had notice of the TRO. His testimony, he gave conflicting testimony several times. But at both his deposition and at the trial, he admitted that he knew that Frank was under Mr. Dewar's- that Mr. Dewar's was not supposed to be selling bypass fats. But that's not the same as saying that I knew that if I did participate and I let him do it, knowing that he was ordered not to, but what evidence is it that he knew the order applied to him? We have that for Ray Gearhart as a direct admission. We don't have it as a direct admission from Todd Gearhart. So Mr. Ray Gearhart, his father, with whom he was obviously working very closely and having extensive email communications where they were both commenting on how this might blow up on them and what might happen to them if they got caught and how important it was for them to cover it up. Mr. Ray Gearhart at 5462 of the Record on Appeal said that he understood that he couldn't- and this is a quote- couldn't work with Frank or help Frank work. He said the same thing again in the Record on Appeal at 5464. I couldn't help Frank work. He then said the same thing again at 5471. And what about Todd Gearhart? I think in the context of this case, it is a reasonable inference that Todd Gearhart and Ray Gearhart- We're in contempt land here. Well, Your Honor, this is a civil contempt and this Court has affirmed the use of circumstantial evidence for contempt on many occasions. So I mean, I would consider, for example, the Waffenschmitt case is an excellent example. So I mean, that is a case where there was not even any direct evidence that the- it was a case where the- where there was an alleged trans- where there was- the original contempnor had been enjoined from dissipating the assets of a securities transaction. The recipients- there were multiple recipients of those funds. One of the issues on the- before this Court on Appeal was whether there was sufficient evidence that the contempnors understood what they were doing was wrong when they took money and they tried to explain that they had taken money from the defendant who was enjoined for legitimate business transactions. The court had- could not prove that they actually received the TRO because there wasn't like a FedEx slip or anything like that. They hadn't admitted that they had received the TRO at the time they started these transactions. At least one of the gentlemen. But the court looked- the trial court, it was Judge Cady, looked at the conduct of the persons who received the funds, their efforts to act in a suspicious way and hide the funds, and concluded that they had noticed from simply their conduct in trying to do squirrelly transactions with the money and their demeanor at trial, and this court said that that was enough to find that the defendants understood, the contempnors understood that what they were doing was a violation of a court's order. And the Waffen-Schmidt case is- I mean it's been a case that's been standing since the 1980s and it's certainly good law. I do want to emphasize as well, Your Honors, that although we're calling this a temporary case, and there have been extensive proceedings here, so Mr. Doar's was represented by Able Austin Texas Council at the time the order was entered. There was full briefing before the order was entered. There was a hearing with argument. The order was drafted by the participation of counsel for both sides. And then the court here proceeded once the injunction issue, or excuse me, the contempt issue arose, the court, through Magistrate Judge Austin, proceeded in a very deliberate and thoughtful manner. I mean, I will point out that first, the plaintiffs took a very targeted approach. The plaintiffs did not seek to hold in contempt the friends and family of Mr. Doar's, for instance, who had received the funds as intermediaries. And the court took a very thoughtful approach in requiring the plaintiffs to show a prima facie case to show that there was jurisdiction and a basis for proceeding. And the court, Magistrate Judge Austin, actually peeled back one of the alleged contemporaries, Mr. John Franklin, because the court was making it very clear that the court expected the plaintiffs to be able to have strong evidence. The court then allowed discovery. There were depositions. There was document discovery. There was briefing. There was this two-day trial. The second day, I think we went to about 630 at night. Then there was post-trial briefing. And then there was a very thoughtful opinion. So I understand that there are cases on occasion that come before this court where a contempt looks like it came out of haste or of precipitous action. But this is the exact opposite. The order was entered with thought and due deliberation. And then it has been enforced by the court through very thoughtful and careful deliberation and numerous opportunities for the appellants, the parties who are now the appellants, the contemporaries, to present their side of the case. And I think it's very telling that the horse that the defendants, the contemporaries, rode throughout the hearing, this is a gift. And Mr. Doar's was on disability. We didn't have any business dealings with Mr. Doar's at all from the time he went on disability in October up until today. That was the, we didn't even know about the TRO, had no idea a TRO had been entered. Those were the factual theories that were advanced. Those were the theories that were advanced, the testimony. That is the knowledge and mindset and intent that was demonstrated conclusively through the witness's own testimony, the contemnator's own testimony in open court. We are left at this point with the arguments that are before this court as what is at best arguments that were dreamt up in the law library as a second or third or fourth attempt to justify conduct that everybody knew violated this order at the time. There is no risk of unfairness here. There was ample notice, ample opportunity to be heard, to be considered, and what has happened to the contemporaries here, if this court affirms, is exactly what they expected would happen to them and exactly what they predicted in their own emails back and forth between each other at the time that they were engaged in the contempt. So, if the panel has no further questions, I will take my seat. Thank you, Counsel. Thank you. Your Honors, very briefly. You heard a lot from opposing counsel about things that Frank Doars did and a little bit about things that Ray Gearhart did. You heard very little about what my client, Todd Gearhart, did. The fact remains the only thing that he was shown to have done is to have acceded to a request from his father to pass along this money. That does not violate a clear and specific order of the court. The plaintiffs below conceded, in fact, that perhaps the exact language of the order doesn't prohibit this exact conduct, and I think that is fatal here. Civil contempt must be narrowly construed. I also know— When he sent the fake invoices to Wawasan, didn't he ask, does this work? He asked if that was what he was being instructed to do. When he said, does this work, that's what he was being instructed to do. The evidence below is uncontroverted that he was never actually served with a copy of this temporary restraining order. He naively believed that Wawasan understood that Frank Doars was being buried in legal fees by his dispute with the plaintiffs. Wawasan, at the same time, was in their own protracted dispute with the plaintiffs, so it was not unreasonable for him to think that perhaps they wanted to help Frank Doars. We talked a lot about what Frank Doars was doing, but what Todd Gearhart knew about what Frank Doars was doing was entirely lacking. That actual notice piece that we talked about, Your Honors, does not just go to the elements of the civil contempt finding against my client. It also goes to personal jurisdiction in this case. There was no connection between Todd Gearhart's activity and the Western District of Texas. The only way he was arguably, even within the jurisdiction of the Western District of Texas, was if he knew that the Western District of Texas had issued an order, it would have been reasonable for him to expect to be hailed into that court. There was no evidence at all, no finding, that he knew of the involvement of the Western District of Texas. He knew of a prior state court order, vaguely, that he really thought had nothing to do with him. It was forwarded to him by email, he forwarded on, but it wasn't addressed to him, it wasn't served on him, it didn't mention him. For all those reasons, we'd ask that you reverse the order. Thank you. May I please the Court, three points and I'm done. First point is, rarely do I have a record site to give the Court in rebuttal, but I do this time. So I would commend the Court's attention to page 3968 of the over 6,000 page record. 3968? 3968, yes, Your Honor. And on that page, I won't read it to you, you can read it for yourself, but clearly the issue of the solicitation versus the competition is raised. And if you'll remember, the Magistrate Judge, for reasons that should be obvious to everybody, preferred to have the parties put their arguments in a closing brief rather than to take up more of the Court's time in court. So that was squarely put before the Court. That's point number one. What's going on at that page of the record? Is that testimony, is that an argument to the Magistrate, what is that? It's an argument based on the evidence that the Magistrate Judge had heard. And the page I'm referring to is summary. It goes back to it again, but that's the summary of the arguments being made. Second point is that with respect to the evidence that was before the Court, the Court even found that there was no direct evidence of any solicitation during that time period. It's in the Magistrate Judge's report and recommendation. So Judge Higginson, we do get to the issue that you raised about circumstantial evidence, indirect evidence. And I'll just point out that in this area of anti-solicitation provisions, in this world, Judge Owen, as you pointed out, of contempt and all it carries, that you need to be very careful when you enforce these anti-solicitation provisions. Judge Owen, last year in the G.E. Case, you held, or the panel held, that the contention that the plaintiff must have solicited clients because she allegedly misappropriated files with their information amounts to speculation. Final point, if I might, this new standard for enforcement of actions that, while not expressly prohibited, nonetheless violate the reasonably understood terms of the order. That's basically saying that you as judges are not going to interpret the order. We're going to rely on how a person who might be on the receiving end of a contempt motion interprets the order. And if they interpret it in a way that's broader than it really is, we're going to stick them with that. Thank you, Judge. Thank you. That concludes the arguments this afternoon. The Court will be in recess until 1 o'clock tonight.